UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILLIE B. SMITH | * | CIVIL ACTION NO. 15-5135 |
| | * | |
| | * | SECTION:  "G"(1) |
| VERSUS | * | |
| | * | JUDGE |
| CAROLYN COLVIN, ACTING | * | NANNETTE JOLIVETTE BROWN |
| COMMISSIONER OF SOCIAL SECURITY | * | |
| | * | MAGISTRATE JUDGE |
| | | JANIS VAN MEERVELD |
| ************************************ | * | |

## REPORT AND RECOMMENDATION

The plaintiff, Willie B. Smith ("Mr. Smith"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for child's insurance benefits (survivor's claim) under Title II of the Social Security Act, 42 U.S.C. § 423(d)(1)(A), and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the motion for Summary Judgment by Mr. Smith (Rec. Doc. 21) be DENIED; and the cross-motion of the Commissioner for summary judgment (Rec. doc. 22) be GRANTED.

## Procedural Background

On June 25, 2012, Mr. Smith submitted an application for child's insurance benefits (survivor claim). R. at 202.  On the same day he also applied for SSI. R. at 209. In both applications, he reported that he was disabled since October 1, 2002.  R. at 202-03, 209.  The disabling conditions were asthma, sinus and speech disorders.  R. at 290.  On September 11, 2012, the state

agency determined that he was not disabled.  R. at 102-112.  He was notified of the decision.  R. at 125-32.

Mr. Smith requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 4, 2013. R. at 16, 125-38. A supplemental hearing was conducted on February 6, 2014. R. at 70.  Mr. Smith was represented by counsel at both hearings.  R. at 16, 70.  On February 28, 2014, the ALJ issued an adverse decision.  R. 61-65.  On August 11, 2015, the Appeals Council denied a request for review.  R. at 1-6.

On October 13, 2015, Mr. Smith filed a complaint in federal court for review of the Commissioner's decision.   (Rec. Doc. 1).   The Commissioner answered and filed the administrative record.  (Rec. Docs. 18 and 19).  The parties filed cross-motions for summary judgment.  (Rec. Docs. 21 and 22).  Mr. Smith is represented by counsel.

## Evidence in the Record

*1.  Mr. Smith's condition*

The first record evidence of Mr. Smith's condition is an Orleans Parish Public School System Integrated Report of Evaluation of Mr. Smith completed in 1998 when he was 6 years old. R. at 377. It refers to test results from March 10, 1995, at which time Mr. Smith was 33 months old, but was assessed at a development age of 23 months and a development range of "significantly delayed performance" using the Bayley Scales of Infant Development (Second Edition). R. at 379. The 1998 evaluation includes the record of a teacher interview stating that Mr. Smith's progress had been slow and he was not ready to be placed into a regular first grade classroom. Id.  The report also includes a medical review and evaluation, which states that Mr. Smith has "a history of Attention Deficit Disorder" and that "due to his severe 'attention lapses' he would qualify for Special Education Services." R. at 385. The section of the report assessing limitations in major life

activities concluded that Mr. Smith had functional limitations in the areas of speaking and learning.
Id.

The next report is an Individualized Education Program ("IEP") evaluation dated April 15,
2004, which appears to have been completed by Alicia Arthur, an educational diagnostician. R. at
391. She reported that at the time of the evaluation, Mr. Smith was 11 years old and reading at a
2.5 grade level according to recent "success for all" assessments and performing at a 3.9 grade
level in math according to a Brigonee Assessment. Id.  She also reported that Mr. Smith had good
behavior and peer relationships, but could become extremely agitated in crowded situations and
could become non-communicative in stressful situations. Id.

The next IEP evaluation in the record reports a meeting date of March 23, 2010, when Mr.
Smith was 17 years old and in 11th grade. R. at 270. It reports that Mr. Smith needs extra help in
literacy, and "support in Math, English and the development of skills that will allow him to live
independently." R. at 271.  The report indicates that Mr. Smith was "expected to make normal
progress in the general education curriculum with modifications and accommodations." Id.  It also
reports that "[a]ccording to the WRAT, [Mr. Smith] is performing at a 5th grade level in
mathematics." R. at 274.

Mr. Smith testified that he completed school through 12th grade and obtained a certificate.
R. at 75.

On March 23, 2011, Scuddy Fontenelle, III, Ph.D., performed a psychological evaluation
of Mr. Smith and assessed Mr. Smith as having a full scale IQ of 74 in the "borderline" range using
the Leiter International Performance Scale- Revised. R. at 407. Dr. Fontenelle concluded that Mr.
Smith "shows significant weakness in his verbal based reasoning and language reasoning
abilities." Id.  Dr. Fontenelle also found that Mr. Smith "fully understands one step instruction."

Id.  In assessing Mr. Smith's mood and affect, Dr. Fontenelle reported that Mr. Smith "is not prone to anger nor aggressive outburst." R. at 408. He determined that Mr. Smith "is able to handle money, fast food and cell phone" and that he was "able to follow simple and basic repetitive instruction." Id. He also concluded Mr. Smith can meet his personal care needs. Id.  He determined that Mr. Smith "is able to work at one particular task for 2 hour duration" and that he "is able to handle routine responsibilities of work when given opportunity for employment in a semi-skilled vocational program." Id.  The report included a diagnostic impression of a current GAF of 55. Id. Dr. Fontenelle recommended that Mr. Smith would need assistance in managing funds. R. at 409.

About a month later on April 27, 2011, vocational assessor Ann Bonner of Goodwill Industries of Southeastern Louisiana performed a Community-Based Employment Assessment. R. at 226. Mr. Smith's math level was estimated to be at mid-fourth grade level, his reading level at mid-fifth grade level, and his reading comprehension at a mid-second grade level. R. at 227-28. Mr. Smith was provided with a job application to complete, and the diagnostician noted that he was able to correctly report his basic information. R. at 228. However, he provided incomplete information for education and availability and his penmanship required improvement so she concluded that he would benefit from practice and assistance with future applications. Id.  Ms. Bonner also concluded that Mr. Smith would benefit from a supported employment placement in an entry level position in the service field. R. at 229. She felt he would require assistance in acclimating to a new work environment and that he would benefit from a job coach to direct him in appropriate work related behavior. Id.

On June 1, 2011, Ms. Bonner conducted a situational assessment where Mr. Smith performed job duties of a retail associate at a Goodwill store. R. at 231. He performed tasks like straightening books and clothing and some restocking from dressing rooms for about 45 minutes.

Id.  Ms. Bonner concluded he was "able to follow the demonstrated instructions with close supervision." Id.

On July 26, 2013, Barbara M. Watkins, a licensed clinical social worker with Louisiana Behavioral Health Partnership conducted an Independent Behavioral Health Assessment of Mr. Smith. She rated his functional status impairment as "Moderate". R. at 417. She described his behavior and thought content as within normal limits, his attitude as cooperative and guarded, and his speech as hesitant. Id.  She marked that his judgment, concentration and insight were impaired. R. at 418. She reported that Mr. Smith's functional status level was moderately impaired and that he had "ongoing and/or variable severe deficits in interpersonal relationships, ability to engage in socially constructive activities and ability to maintain responsibilities." R. at 419.

On August 1, 2013, Mr. Smith had an appointment with the Metropolitan Human Services District ("MHSD"), from which he had requested development disabilities services. R. at 434. Cynthia Jeanpierre filled out an Inventory for Client and Agency Planning ("CAP") form. R. at 440. She marked Mr. Smith's level of mental retardation as Mild (IQ 52-70). R. at 442.  She marked Mr. Smith as almost always capable of working at a steady pace on a job for at least two hours, but as never or rarely completing job applications, budgeting money, counting change, or balancing a checkbook. R. at 444. No change was recommended to Mr. Smith's independent living arrangement. R. at 449. His current formal daytime activity was marked as "competitive employment." Id.  The Court notes that Ms. Jeanpierre did not select "sheltered workshop" to describe his employment. Id.

At the hearing on February 6, 2014, Mr. Smith testified that he lives by himself, but that his sister basically takes care of everything for him. R. at 26-27. Mr. Smith's sister Cornelia Lynn Smith testified that she was in contact with him seven days a week. R. at 37. She said that she

prepares meals for him and assists with cleaning. R. at 38, 88. She also testified that she helps him manage his money and bills, and she said that Mr. Smith would not be capable of getting change when making a purchase. R. at 89, 92.  Ms. Smith stated that Mr. Smith could prepare simple meals like hotdogs or sandwiches, but could not use the stove. R. at 89. Ms. Smith also testified that Mr. Smith's managers would print out his schedule for him at work and that Mr. Smith would need to check that schedule to remember to be at work on a particular day at a particular time. R. at 90.

2.  *Mr. Smith's Work History*

At the September 4, 2013, hearing, Mr. Smith testified that he was working about 20 hours a week as a cart pusher at Walmart. R. at 76. He explained that he corrals the shopping baskets outside and brings them to the store. R. at 77. When asked whether he needs any help doing his work, he stated "I worked with other people outside." Id.  When asked how other people help, he responded, "[b]y corralling them and get the machine in, just bring them all together." Id.  Mr. Smith said that he had a supervisor, but that he thought she was the manager of all the cart pushers and not a special supervisor for him. R. at 81. He also testified that sometimes he helps people bring their groceries to their car when he is instructed to do so. R. at 84-85. When asked whether he would be able to obtain other employment if he lost his job at Walmart, Ms. Smith said he would not be able to because he does not know how to fill out a job application by himself. R. at 94. Mr. Smith's sister testified that Mr. Smith had obtained the employment through a program called Lifeworks. R. at 87. Mr. Smith testified that his counselor with Lifeworks comes to check on him every day, then he clarified that she comes certain days, and then he stated she checks on him every week. R. at 79-80. At the second hearing conducted February 6, 2014, Mr. Smith simply testified that his Lifeworks counselor comes to check on him "maybe once a week." R. at 33.

At the February 6, 2014, Mr. Smith also said that for the last several months he had been doing janitorial work cleaning bathrooms and wiping the floors at Walmart. R. at 22. He explained that in November (presumably November 2013), he had temporarily stopped working at Walmart after he hit somebody's car with a cart. R. at 24. Mr. Smith testified that he got his job back when his employer called him to come back.  R. 24. Mr. Smith's attorney him asked whether his supervisors at Walmart were "generally pretty accommodating with you [because you might be a little slower than other employees or you might not grasp instructions quite the same way someone else would]? They give you the benefit of the doubt?" R. at 36. Mr. Smith answered, "Yes, sometimes." Id.

Mr. Smith testified that he works about twenty-five hours a week. R. at 26. When asked why he was working less than before, he explained that his rent had gone down, and he also said it was his sister's idea. Id.  When she testified, Mr. Smith's sister denied it was her idea for him to work fewer hours and she stated that she believed his supervisors felt Mr. Smith had been working more hours than he could handle. R. at 38.  Ms. Smith testified that Mr. Smith had been working 18 to 20 hours a week, about four or five hours a day. R. at 41.

The record evidence includes several employment records from Walmart. In Mr. Smith's 90 day evaluation on July 15, 2012, Smith was marked as consistently demonstrating performance that meets job requirements for all categories of assessment. R. at 242.  Mr. Smith's employment records include records of three written "coachings." R. at 256. On September 29, 2012, after Mr. Smith was observed talking with another employee while not on break, he was coached to stay productive at all times while on the clock. Id.  In the second incident on November 7, 2012, after he squeezed a customer between shopping carts and a concrete post, Mr. Smith was coached to be more aware of surroundings and more cautious during peak hours. Id.  The third incident on

January 12, 2013, was described as mishandling of shopping carts after which Mr. Smith was coached to use proper safety procedures and be more aware of his surroundings. R. at 257. About two months later on March 28, 2013, his employment records show he received a pay increase to $8 per hour. R. at 269.

At the September 4, 2013, hearing, Mr. Smith and his attorney said that Walmart had a policy to hire mentally challenged individuals. R. at 78. When asked by the ALJ what accommodations were being made for Mr. Smith versus other cart pushers, Mr. Smith's counsel argued that the accommodation made for Mr. Smith was that Walmart hired him. R. 78. The ALJ told Mr. Smith's counsel that they would need to present some information from Walmart to establish Mr. Smith's employment as a sheltered work environment. R. at 96.

On October 4, 2013, counsel for Mr. Smith wrote to the ALJ and reported that he had not received a vocational assessment from Metropolitan Human Services District, but he provided an email from Walmart's associate general counsel stating:

> Walmart does hire associates of various skills and abilities (depending upon whether they meet the minimum qualifications of the position and are otherwise qualified) as evidenced by [Mr. Smith] being hired, but, I cannot go as far as to say the company "strives to make efforts to create unique positions" for the purpose of hiring mentally disabled individuals. Each position is designed to serve a function and, unfortunately for the situation your client is currently in, the cart pusher position has been occupied by individuals who continued to advance their careers. As a matter of course, I cannot conclude that the cart pusher position is not substantial and gainful.

R. at 365-336. It does not appear that Walmart's counsel was referring specifically to whether *Mr. Smith's* employment was substantial and gainful.

In filing his motion for summary judgment in this Court, Mr. Smith submitted as new evidence the vocational report of Chantella Bowman, a certified and licensed vocational rehabilitation counselor, dated September 29, 2015. (Rec. Doc. 21-5). Ms. Bowman's report is

based on a comprehensive interview with Mr. Smith in the presence of his sister Cornelia. Id. at 3. It also appears that Ms. Bowman considered the job description for Courtesy Associate with Walmart Stores, Inc.[1] Id. at 2. There is no indication that Ms. Bowman observed Mr. Smith on the job or spoke with any of Mr. Smith's co-workers or supervisors.

Ms. Bowman's report explains that in addition to collecting carts and assisting customers with loading their merchandise into their vehicles, a Courtesy Associate's responsibilities include safely using the cart retrieval equipment, acknowledging the customer, identifying and resolving customer issues and concerns, assisting with purchasing decisions, locating merchandise and promoting products. Id. Ms. Bowman noted that Mr. Smith stated that the other cart pushers were at times asked to do other duties inside the store, but Mr. Smith is not. Id. at 2. Ms. Bowman reported that Mr. Smith would not typically use the electric cart pusher because he had lost the "tracker" on several occasions. Id. at 2. Ms. Bowman reported that as a result, his speed of collecting carts is significantly reduced. Id. at 3. Ms. Bowman concluded that:

> [d]ue to his cognitive limitations, Willie Smith has difficulty with completing all of the specific tasks outlined in his position description which results in a significant vocational impairment. Willie's job at Walmart has been carved to accommodate the difficulties he has with carrying out the essential functions of the job. Rather than being required to perform the full scope of duties associated with a position as a Courtesy Associate, Willie is only required to collect the shopping carts and bring them into the store. Mr. Smith's job duties are especially suited to accommodate his impairment. His production is significantly decreased when collecting carts as he is not required to utilize the electronic cart pusher. Willie is permitted to work at this lower standard of productivity in order to accommodate his cognitive impairments. Willie has achieved satisfactory progress while on the job due to the sheltered nature of his employment position.

Id. at 4.

---

[1] The job description appears in Mr. Smith's employment records. R. at 239.

### 3.  *Testimony of vocational experts*

At the September 4, 2013, hearing, vocational expert Ms. Ellenger was asked to consider a person with Mr. Smith's age, education and past work experience with a residual functional capacity for work at all exertional levels with the following limitations: the person would need a job with simple directions and instructions; routine workplace changes, no fast-paced production requirements; simple work-related decisions. The person would be capable of concentrating for a two hour block of time. Ms. Ellenger testified that such a person could perform Mr. Smith's past work, even if he had the additional limitation of only performing simple routine repetitive tasks. R. at 98. But she testified that if the person could not sustain sufficient concentration, persistence and pace in order complete an eight-hour day, five days per week, there would be no jobs that person could perform. R. at 98. Ms. Ellenger said that her answers would not change if the person needed to be checked on by a supervisor for ten minutes once an hour. R. at 99.

At the February 6, 2014, hearing, vocational expert Ms. Burton,[2] was asked to consider a position where a supervisor would check on a typical employee once every four hours for ten minutes, but a hypothetical individual required the supervisor to check in once an hour for ten minutes.  R. at 53. She testified that the hypothetical individual's work would be considered "sheltered work" or near sheltered work. R. at 54. Ms. Burton also stated that if a hypothetical individual was off task for 20% of any given work day, it would preclude work activity. R. at 55. She further testified that if a person required a ten minute unscheduled break every hour, there would be no work such an individual was capable of performing. Id.

---

[2] The Transcript of the hearing lists the vocational expert as Ms. Burton. R. at 16. The ALJ's Decision refers to Katrina Virden. R. at 61.

**Decision of the Administrative Law Judge**

The ALJ found that Mr. Smith was born in 1992 and he had not attained age 22 as of October 1, 2002, the alleged onset date (20 C.F.R. 404.102, 416.120(c)(4) and 404.35(a)(5)).  R. at 63. The ALJ concluded that Mr. Smith had engaged in substantial gainful activity ("SGA") since April 1, 2012 (20 C.F.R. 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.). R. at 63. In coming to this conclusion, the ALJ considered Mr. Smith's earnings records, which indicated he had been working at Walmart since April 2012. Id. The ALJ recognized that Mr. Smith did not work 40 hours a week, but observed that he typically works over 30 hours per week and his earnings exceed SGA levels. Id.   The ALJ noted Mr. Smith's argument that his work is "sheltered" and that he receives exceptional accommodations. Id.  However, the ALJ concluded that Mr. Smith performed his job without accommodations. Id.  The ALJ recognized that Mr. Smith obtained his job through a job placement assistance service, but noted that his placement counselor only comes to his workplace to check on his progress—not to help him perform his work. R. at 63-64. The ALJ added that Mr. Smith testified that he did not have a special supervisor at work. R. at 64. Thus, the ALJ concluded that the wages Mr. Smith received from Walmart were "countable earnings" and not "subsidies," and therefore Mr. Smith had been engaged in substantial gainful activity since April 2012. Id.   63-65. The ALJ also concluded that since October 1, 2002, the alleged onset date of disability, there had been no continuous 12-month period during which Mr. Smith had not engaged in substantial gainful activity. R. at 65. Finally, the ALJ determined that Mr. Smith has not been under a disability, as defined by the Act, from October 1, 2002, through the date of the decision (20 C.F.R. 404.350(a)(5), 404.1520(b) and 416.920 (b)). Id.

**Statement of Issues on Appeal**

Issue No. 1.    Whether the ALJ misapplied the applicable law to the facts in reaching the conclusion that Mr. Smith's employment was substantial and gainful.

Issue No. 2.    Whether there is new and material evidence which clearly demonstrates that Mr. Smith's employment at Walmart was accommodated and subsidized.

**Analysis**

## I.   Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 11360 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

II.     **Entitlement to Benefits under the Act.**

A child of an individual who dies a fully or currently insured individual under the Act is eligible for social security insurance benefits if the child is under a disability that began before he attained the age of 22. 42 U.S.C. § 402(d)(1). To be considered disabled, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.   __Plaintiff's Appeal__.

<u>Issue No. 1</u>.   Whether the ALJ misapplied the applicable law to the facts in reaching the conclusion that Mr. Smith's employment was substantial and gainful.

*1.  The parties' arguments*

Mr. Smith argues that the ALJ's decision should be reversed because the ALJ failed to apply the test set out in Social Security Ruling (SSR) 83-33 when determining whether Mr. Smith's employment was substantial and gainful. (Pl.'s Mem. Supp., at 6, Rec. Doc. 21-1). Under SSR 83-33, Mr. Smith submits, earnings are considered subsidized and not substantial and gainful when an employer pays more in wages than the reasonable value of the services because of a benevolent attitude towards a handicapped individual. <u>Id.</u> at 6-7. He argues that the ALJ failed to consider the factors listed in SSR-83-33 as indicating a strong possibility of subsidized employment. <u>Id.</u>  The circumstances strongly indicating subsidized employment are:

> (1) The employment is "sheltered;" or
> (2) Childhood disability is involved; or
> (3) Mental impairment is involved; or
> (4) There appears to be a marked discrepancy between the amount of pay and the value of the services; or
> (5) The employer, employee, or other interested party alleges that the employee does not fully earn his or her pay (e.g., the employee receives unusual help from others in doing the work); or
> (6) The nature and severity of the impairment indicate that the employee receives unusual help from others in doing the work; or
> (7) The employee is involved in a government-sponsored job training and an employment program.

<u>Titles II & XVI: Determining Whether Work Is Substantial Gainful Activity-Employees</u>, SSR 83-33, 1983-119 Soc. Sec. Rep. Serv. 94, 1983 WL 31255 (Jan. 1, 1983). Mr. Smith insists that his employment is sheltered because he was repeatedly counseled for poor performance but retained as an employee and even rehired after a short period of termination. (Pl.'s Mem. Supp., at 8-9,

Rec. Doc. 21-1). He says that a childhood disability and mental impairment is unquestionably involved. Id. at 9. He argues that there is a discrepancy between the amount of pay versus the value of services provided because Mr. Smith does not perform the full scope of responsibilities required of a Courtesy Associate. Id.  He points out that Mr. Smith performs no customer service unless directed. Id.  Mr. Smith's counsel submits that Mr. Smith receives unusual help from others in doing his work, noting that Mr. Smith testified that he receives assistance in gathering carts. Id. Mr. Smith argues that his participation in Lifeworks, which helped him get the job and assigned him a counselor who comes to check on him, supports factor 7. Id.

The Commissioner responds that although the ALJ did not specifically refer to SSR 83-33, she did consider the factors announced therein. (Def.'s Mem. Supp., at 3, Rec. Doc. 22-1). The Commissioner notes that the ALJ considered and rejected the proposition that Mr. Smith works in sheltered employment. Id.  The Commissioner points out that the ALJ concluded that Mr. Smith performs his work without special accommodations. Id.  The Commissioner argues that although Mr. Smith was reprimanded three times at work, Mr. Smith has not shown that other employees would have been terminated for the same infractions. Id.  As to the rehiring of Mr. Smith, the Commissioner points out that the employment records do not show any break in employment and further, that there is no evidence that an unimpaired individual would not have been rehired. Id. at 3-4.

The Commissioner adds that the report of Ms. Bonner at Goodwill does not demonstrate Mr. Smith requires sheltered employment because Ms. Bonner found Mr. Smith could work at an entry level position in the service industry with limited academic demands. Id. at 4. The Commissioner further argues that having a job coach is insufficient to classify Mr. Smith's employment as sheltered. Id.  The Commissioner notes that the definition of sheltered employment

in SSR 83-33 is "employment provided for handicapped individuals in a protected environment under an institutional program." Id.  The Commissioner insists that Mr. Smith's employment does not satisfy this definition. Id.

  2.  *Applicable law*

When determining whether a claimant is engaged in substantial gainful activity, "the value of any subsidized earnings" and "the reasonable cost of any impairment-related work expenses" are subtracted from the claimant's gross earnings. 20 C.F.R. § 404.1574 (b)(1). The resulting amount is then averaged and compared to the Commissioner's earnings guidelines. Id.  When the average monthly earnings are more than $1,010 for 2012, $1,040 for 2013, or $1,070 for 2014, the claimant has engaged in substantial gainful activity. Id. § 404.1574 (b)(2); see Substantial Gainful Activity Table, https://www.ssa.gov/oact/cola/sga.html. "[W]ork may be substantial even if it is performed on a part-time basis . . . ." 20 C.F.R. § 404.1572(a); see Ladd v. ITT Corp., 148 F.3d 753, 754 (7th Cir. 1998) ("As long as the worker can engage in "substantial gainful activity," he is not disabled even if the only work that he is capable of doing is only part time." ).

Work is considered subsidized if the "true value" of the work "when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to [the claimant] for [his] work." 20 C.F.R. § 404.1574(a)(2). In other words, work is subsidized when the claimant is "paid more than the reasonable value of the actual services performed." Id. For example, for purposes of determining substantial gainful activity, where a seriously impaired person does simple tasks under close and continuous supervision, the claimant's gross wages may be reduced by the amount that the claimant's work is determined to be subsidized. See id.  The Social Security Ruling ("SSR") cited by Mr. Smith explains that:

  In most instances, the amount of a subsidy can be ascertained by comparing the time, energy, skills, and responsibility involved in the individual's services with the

> same elements involved in the performance of the same or similar work by unimpaired individuals in the community and estimating the proportionate value of the individual's services according to the prevailing pay scale for such work.

SSR 83-33, supra, at *3. Where such a precise evaluation is not possible, the SSR suggests that the extent of a subsidy may be calculated "on the basis of gross indications of a lack of productivity; for example, when unusual supervision or assistance is required in the performance of simple tasks, or the employee is extremely slow, inefficient or otherwise unproductive." Id. at *4. Mr. Smith correctly outlined the factors listed in SSR 83-33 as indicating a "strong possibility of a subsidy." Id.[3]  The SSR also contemplates the possibility that an employer calculates the subsidy itself, and in such case, the amount designated by the employer as subsidized "will normally suffice." Id. Where the employer cannot identify and explain a specific amount as a subsidy, "then it will be necessary to obtain answers to the questions outlined in this section." Id.

Separately from the calculation of subsidized earnings, the Regulations also contemplate that where a person works "under special conditions," he may not be engaged in substantial gainful activity. 20 C.F.R. § 404.1573(c). Special impairment related conditions that should be considered include "special assistance from other employees in performing" the work, "irregular hours or frequent rest periods," use of special equipment or specially arranged circumstances like "other persons helped [the claimant] prepare for or get to and from" work, a "lower standard of productivity or efficiency," or the job was provided because of family or personal relationships or the "employer's concern for [the claimant's] welfare." Id.

The ALJ has a duty to "develop the record fully and fairly" relating to an applicant's claim for disability benefits. Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995); Thorton v. Schweiker, 663 F.2d 1312, 1316 (5th Cir. 1981) ("[T]he ALJ has a special responsibility to develop a full and

---

[3] The factors are cited on page 14, supra.

fair record upon which to base his decision."). Where the record is ambiguous or incomplete, the ALJ should inquire further by requesting a medical source statement, subpoenaing the claimant's physicians or holding a second hearing. See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001); Ripley, 67 F.3d at 557; Cintron v. Bowen, 686 F. Supp. 522, 524 (E.D. Pa. 1988) ("If the ALJ believes claimant's evidence was unclear or inclusive [sic], the ALJ should secure evidence needed to make this determination."). However, the claimant is only entitled to reversal if the ALJ's failure to satisfy this duty results in prejudice to the claimant. Ripley, 67 F.3d at 557.

For example, a magistrate judge in the Middle District of Florida recommended remand for reconsideration of whether the claimant was engaged in substantial gainful activity because the ALJ had not sufficiently considered whether the claimant's employment was subsidized. Henn v. Comm'r of Soc. Sec., No. 211-CV-385-FTM-29SPC, 2012 WL 2814011, at *13 (M.D. Fla. June 14, 2012), report and recommendation adopted sub nom. Henn v. Astrue, No. 2:11-CV-385-FTM-29, 2012 WL 2813878 (M.D. Fla. July 10, 2012). The claimant had submitted a Supervisor Work Form prepared by the claimant's employer, which indicated that 20% of claimant's work had been assumed by others because of her skin lesions. Id. at *12-13. The magistrate judge found that other than referring to receipt of the Supervisor Work Form, there was no indication that the ALJ had considered whether the claimant's employment was subsidized. Id.  Accordingly, the magistrate judge determined that the ALJ's finding that claimant engaged in substantial gainful activity was not supported by substantial evidence and remanded. Id.

3. *Analysis*

There is no dispute that if all of Mr. Smith's earnings are counted, he has met the level required to be considered engaged in substantial gainful activity. The issue is whether his earnings should have been discounted by the value of the portion of his work, if any, that is subsidized.

18

While the ALJ did not go through the SSR 83-33 factors one by one, unlike the ALJ in Henn, it is clear that the ALJ here considered whether Mr. Smith's work was subsidized. Indeed, in concluding that his earnings are not "subsidies," the ALJ determined that Mr. Smith does not "receive special accommodations in order to perform his job" and he "appears to put forth the same amount of time, energy, and skill into his job as a cart pusher as someone who is an unimpaired individual." R. at 64-65. She also reviewed the psychological opinion of Dr. Fontenelle in concluding that Mr. Smith's cognitive limitations were not so severe as to require special accommodations. R. at 63-64.

Further, the Court finds that substantial evidence supports the ALJ's conclusion that Mr. Smith's work is not subsidized and that his earnings are "countable earnings." First, the evidence indicates that Mr. Smith is capable of employment without limitations. As the ALJ noted, the Goodwill Assessment by Ms. Bonner reported that Mr. Smith could fill in his basic information on a job application. Moreover, after Mr. Smith's situational assessment, Ms. Bonner reported that Mr. Smith worked for 45 minutes on two activities as a retail associate. R. at 231. She also reported that he was able to follow demonstrated instructions with close supervision. Id. Dr. Fontenelle's opinion included the assessment that Mr. Smith could work on a particular task for two hours. R. at 408. Similarly, the MHSD form also indicated that Mr. Smith was almost always capable of working at a steady pace on a job for at least two hours. R. at 444. When asked about a person who would need simple instructions, no fast paced production requirements, make only simple decisions and be capable of concentrating for a two hour block of time, vocational expert Ellenger testified that such a person could perform Mr. Smith's past work even if he was also limited to simple routine repetitive tasks. R. at 98.

Further, there is no evidence that Mr. Smith does not fully earn his pay. Although Mr. Smith testified that he had help corralling carts, there is no indication from his testimony that the help is anything extraordinary. Mr. Smith testified that he did not have a special supervisor and as the ALJ observed, Mr. Smith's counselor with Lifeworks only came once a week and did not assist him with performance of his job duties. The only evidence from Walmart does not indicate his work is subsidized. His 90 day performance review reports that he was meeting job requirements for all categories. R. at 242. There is nothing in the record to suggest that the three reprimands Mr. Smith received by his Walmart supervisors would have resulted in termination of other employees. And as the ALJ noted, there is nothing in the record to indicate that Mr. Smith was only rehired because he was liked and not because Walmart desired Mr. Smith's services. R. at 64.

When explicitly considering the seven factors listed in SR 83-33, the Court finds that substantial evidence supports the finding that Mr. Smith's employment was not subsidized. Mr. Smith's employment is not sheltered. As the Commissioner points out, the term "sheltered" refers specifically to an institutional program providing protected employment for handicapped individuals. There is no evidence Walmart runs such a program. The email from Walmart's counsel denies that Walmart has created special positions for mentally disabled individuals. Although Mr. Smith's cognitive impairments have existed since childhood and involve mental impairments, the ALJ's conclusion that the limitations do not incapacitate Mr. Smith is supported by substantial evidence including the psychological opinion of Dr. Fontenelle who assessed Mr. Smith in the borderline range of intellectual functioning and found Mr. Smith was able to meet his personal care needs, could handle money, and could handle routine responsibilities of work.  There simply is no evidence to support the fourth factor of a marked discrepancy between the amount of pay and the value of the services. For example, there is no evidence at all as to the value of Mr.

20

Smith's services compared to similar services performed by a person without his mental impairments. As to the fifth factor, while Mr. Smith's counsel argues that Mr. Smith's employment is subsidized, it appears his employer was unwilling to take this position and Mr. Smith himself did not testify that he was not fully earning his pay. There is also limited evidence on the sixth factor. Evidence from Walmart does not indicate any unusual help. And Mr. Smith's own testimony that he receives help in corralling carts does not indicate any unusual help. Mr. Smith did not testify whether other cart pushers receive help or how much compared to him. The seventh factor has not been met here because there is no government-sponsored job training and employment program at issue. Although Mr. Smith received assistance from Lifeworks, it does not appear this is a government sponsored employment program. Moreover, while the assistance Mr. Smith has received through Lifeworks is important, it does not indicate that Mr. Smith is not actually earning the pay he receives. As the ALJ pointed out, his Lifeworks counselor does not assist him in performing his work.

The Court finds that the ALJ adequately considered whether Mr. Smith's employment was subsidized and that her conclusion that his employment is not subsidized is supported by substantial evidence. Finally, even if the ALJ should have considered the SSR 83-33 factors explicitly, her failure to do so item by item is not prejudicial because there is no evidence related to the factors that could have changed the ALJ's conclusion that Mr. Smith's employment is not subsidized.

Issue No. 2.     Whether there is new and material evidence which clearly demonstrates that
                Mr. Smith's employment at Walmart was accommodated and subsidized.

### 1. *Parties' arguments*

Mr. Smith urges this Court to consider the report of Ms. Bowman, submitted as new evidence along with his Motion for Summary Judgment. (Pl.'s Mem. Supp., at 10, Rec. Doc. 21-1). He argues that the evidence is new because the report was not created until September 29, 2015. Id.  He insists the evidence is material because Ms. Bowman's report affirms the sheltered nature of Mr. Smith's employment. Id.  He asserts that the report deals with the time period for which benefits were denied because the report discusses the same disciplinary incidents that indisputably occurred during the time period at issue. Id. at 11. He does not explain why he failed to provide a vocational report like that of Ms. Bowman to the ALJ.

The Commissioner responds that Ms. Bowman's report does not justify remand because her report is not based on objective evidence from Mr. Smith's employer showing that Mr. Smith does not perform the same duties as an unimpaired person in his same position. (Def.'s Mem. Supp., at 6-7, Rec. Doc. 22-1). Instead, the Commissioner notes, Mr. Smith continues to rely on his own assertions regarding his work duties. Id. at 7. The Commissioner adds that Ms. Bowman's report does not raise any assertions that were not previously before the ALJ. Id. Further, the Commissioner argues that Mr. Smith has not provided a reason for why he failed to have Ms. Bowman conduct an assessment prior to the ALJ's decision. Id.

### 2. *Applicable law*

The Fifth Circuit instructs that "[i]n order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence

into the record in a prior proceeding." Leggett v. Chater, 67 F.3d 558, 567 (5th Cir. 1995) (quoting Bradley v. Bowen, 809 F.2d 1054, 1057–58 (5th Cir. 1987) (alteration omitted). Evidence is material if there is a "reasonable possibility that it would have changed the outcome of the Secretary's determination." Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994) (quoting Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981)).  Further, "the new evidence must also pertain to the contested time period and not merely concern a subsequently acquired disability or the deterioration of a condition that was not previously disabling." Leggett, 67 F.3d at 567.

In Leggett, the Fifth Circuit held that a recent psychiatric exam did not justify remand. 809 F.2d at 1057. The court of appeals agreed the evidence was new and material to the plaintiff's disability claim, but found that the plaintiff had not provided "a satisfactory explanation for its absence from the initial proceedings." Id.  Mr. Smith cites Latham v. Shalala without referring to the good cause requirement. However, the Fifth Circuit in Latham considered and found good cause because the Veterans Affairs Rating Decision that the plaintiff submitted as new evidence was not available at the time of his social security application, although he had applied for but was waiting for the rating decision at the time.  36 F.3d at 483. The court of appeals went on to find the rating decision was material because the rating decision found the plaintiff disabled and, like a physician's finding, such finding would be entitled to "great weight." Id.  The court of appeals noted that the ALJ's decision to deny benefits had been based partly on the fact that none of the plaintiff's physician's had pronounced him disabled. Id.

### 3.  Analysis

The report of Ms. Bowman is new. While it is based on the statements of Mr. Smith, the vocational rehabilitation expert brings her experience in analyzing Mr. Smith's work responsibilities against the work listed in the job description. Regardless of whether the report is

material, however, Mr. Smith has provided no explanation for why he failed to provide a vocational report during the proceedings before the ALJ. Nor does Mr. Smith articulate a reason why he himself did not testify that he did not use the electronic cart pusher but that other cart pushers did so if that was indeed the case at the time of the ALJ's decision. The ALJ allowed a supplemental hearing four months after the original hearing, but it remains unclear why a vocational report was not obtained during that period. Without good cause, the Court cannot consider the new evidence. Moreover, the Court is not convinced that the vocational report deals with the time period at issue (that is, the time through the date of the ALJ's decision). Mr. Smith insists it deals with the period in question because it references the three reprimands Mr. Smith received. While the Commissioner does not appear to dispute the time period issue, the Court finds the report from September 2015 would necessarily consider the period after the ALJ's February 2014 ruling, even if it also considers the period before. The report does not state that is limited to a certain period or delineate certain conclusions that are limited to certain periods of time. The new evidence concerns a period after the ALJ's decision, and the Court is also precluded from considering it on this basis.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the motion for Summary Judgment by the plaintiff (Rec. Doc. 21) be DENIED; and the cross-motion of the defendant, Carolyn W. Colvin, Acting Commissioner of Social Security Administration ("Commissioner"), for summary judgment (Rec. doc. 22) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this  3rd  day of February, 2017.

Janis van Meerveld
United States Magistrate Judge